Defendant-Appellant Wendell Carte appeals his conviction in the Cuyahoga County Court of Common Pleas of rape, attempted rape, kidnapping, felonious sexual penetration, gross sexual imposition and importuning. Appellant asks this court to reverse his conviction on the grounds of prosecutorial misconduct, ineffective assistance of counsel and improper testimony from the state's expert witness. Appellant also asserts that the trial court erroneously denied his Crim.R. 29 motion for acquittal and gave incorrect instructions to the jury in response to a query from the jury during its deliberations. Finally, appellant argues that his conviction is against the manifest weight of the evidence. Finding no reversible error, we affirm.
The record reflects that in June 1995, eleven-year-old Bessie, nine-year-old Loretta and seven-year-old Timothy Poling were removed from their parents' home in Cleveland by Children and Family Services ("CFS"). The CFS social workers were suspicious that the children had been sexually abused and brought them in for an interview. During the interview, Bessie and Loretta denied any sexual abuse. Timothy reported that he had been touched sexually but did not identify the perpetrator.
About one year later, after learning that appellant was now living with her biological parents, Bessie told her foster mother that appellant had raped her. As a result of this disclosure, Bessie, Loretta and Timothy were interviewed by a CFS social worker and Detective Richard Calabrese of the Cleveland Police Department. Bessie and Loretta were also examined by Marcia Thompson, a pediatric nurse practitioner at the Cleveland Clinic.
As a result of the interviews and medical examinations, appellant was indicted on December 18, 1996. He was charged with six counts of rape in violation of R.C. 2907.02, one count of attempted rape in violation of R.C. 2907.02, one count of kidnapping in violation of R.C. 2905.01, six counts of felonious sexual penetration in violation of R.C. 2907.12, four counts of gross sexual imposition in violation of R.C. 2907.05
and three counts of importuning in violation of R.C. 2907.07. The indictment alleged that the offenses were committed between January 1, 1993 and June 30, 1995 and that the alleged victims were five children all under the age of thirteen.
Appellant was arraigned on December 24, 1996. On February 7, 1997, he filed a motion for discovery and a motion for a bill of particulars. Appellant filed a second motion for a bill of particulars on February 24, 1997. On April 10, 1997, appellant filed a motion to compel a response from the state regarding discovery and the bill of particulars. The state responded to both motions on June 20, 1997, three days before trial.
When trial commenced on June 23, 1997, the state identified the alleged victims as Jane Doe Number 1, Bessie Poling; Jane Doe Number 2, Loretta Poling; Jane Doe Number 3, Candace Barnes; Jane Doe Number 4, Rebecca Barnes; and John Doe Number 1, Timothy Poling.
At trial, Bessie Poling testified that before she was removed to a foster home in June 1995, she lived near to appellant's house. Appellant's granddaughter, Missy Carte, was her best friend, and for four or five years, she visited her almost every day.
Approximately sixteen people, including appellant's wife, several of appellant's adult children and their spouses, appellant's nine grandchildren, and several of their friends lived with appellant. Appellant's bedroom, which contained a bed, television, stereo and coffee-maker, was in the basement of the house. There were also a bathroom, sink and laundry room in the basement.
Bessie testified that appellant first raped her in March 1994, when Missy and her family went to West Virginia for a week to attend a funeral. Appellant did not go on the trip. As Bessie was walking by his house to go to a nearby park, appellant asked her to help him clean his house. When she arrived, appellant asked her to go to the basement to make coffee. Appellant followed her to the basement, told her to get on the bed, got on top of her and tore off her jeans. Appellant then went to the bathroom. Bessie testified that when appellant came out of the bathroom, he took off his jeans, got on top of her, and put his penis inside her vagina. Before going back to the bathroom, appellant told Bessie not to tell anyone what he had done or he would kill her. Bessie put her clothes on, and when she heard several people coming down the basement stairs she got up and ran out.
Bessie testified that the second incident involving appellant occurred when appellant grabbed her arm as she was standing on the porch of his house, put her in his van and drove her to his church. Appellant pushed her up the stairs and into an office. After turning off an alarm, appellant told Bessie to get down on the floor. He then got on top of her, unzipped his pants and pulled down her pants. He inserted his finger, and then his penis, into her vagina. Appellant jumped up when he heard somebody coming and told Bessie not to say anything. Both appellant and Bessie had zipped up their pants before the pastor of the church came into the office. Because she knew that the pastor was appellant's friend, Bessie did not say anything to him about what had happened.
After this incident, appellant offered to buy Bessie a pager in exchange for more sexual activity. Bessie refused and appellant did not force himself on her again.
Bessie admitted that she had sex once with her boyfriend prior to the incidents with appellant.
On cross-examination, Bessie admitted that in her statement given to Detective Calabrese on July 3, 1996, she stated that the first rape occurred in the church and the second rape took place in appellant's bedroom. Bessie also admitted that she continued to go to appellant's home after the alleged incidents. She testified that she never told anyone what appellant had done, but that she told her friends to stay away from appellant's house.
Loretta Poling testified that before she was sent to foster care in June 1995, she often went to appellant's house to play with his grandchildren. She ate there, and sometimes bathed there and spent the night. Loretta testified that she liked appellant as a friend and sometimes even called him "grandpa."
Loretta testified that on several occasions when she was in the basement of appellant's house, he touched her chest under her shirt and put his hands down her pants. Loretta stated that appellant also tried to put his penis and his finger in her vagina and forced her to perform fellatio on him. According to Loretta, these incidents occurred more than once but not more than five times. Loretta testified that appellant "tried to, but never did" put his penis inside her, and that no one else ever tried to have sex with her or insert anything into her vagina.
On one occasion, according to Loretta, appellant told her that he was taking her and his granddaughter Crystal to his church to clean it. After appellant and Loretta were in the truck, however, appellant told her that Crystal was not going with them. In an office at the church, appellant put his tongue inside Loretta's vagina. He then put her on a desk, pulled down his pants and tried to insert his penis into her vagina.
Loretta testified that appellant would offer her money after he molested her, sometimes giving her a dollar or fifty cents. Appellant told Loretta that he would kill her if she told anyone what he had done and that if she did not allow him to have sex with her, she could not continue to be his granddaughters' friend.
Timothy Poling testified that before he was removed to a foster home he would go to appellant's house to play with his grandchildren. He stated that once, when he was sleeping on the floor in appellant's bedroom, he woke to find appellant touching his penis. He also testified that on several occasions when he was at appellant's house, appellant touched his genitals.
Rebecca Barnes, who was thirteen years old at the time of trial, testified that she was a friend of appellant's granddaughters and visited them at appellant's house almost every day. According to Rebecca, on more than one occasion when she was alone with appellant in the basement, appellant offered her money for sex. Rebecca testified that she always refused.
Rebecca testified that she and her sister, Candace, who was fourteen years old at the time of trial, would sometimes sleep at appellant's house. According to Rebecca, Candace fell asleep one night on the loveseat in the living room. When Rebecca and appellant's granddaughter Missy came into the room, they saw appellant rubbing Candace's inner thigh. When he saw Rebecca and Missy watching him, appellant stopped what he was doing.
Candace Barnes testified that she did not wake up during this incident but that the next morning, Rebecca told her what had happened. Candace stated that she stopped going over to appellant's house over this incident.
The state's expert, Marcia Thompson, a board-certified pediatric nurse practitioner who specializes in evaluating children who are suspected of being sexually abused, testified that she examined Bessie and Loretta Poling in September 1996.[1] Thompson testified that when she took their medical histories, both Bessie and Loretta denied any trauma or accident to their genitalia.
Thompson stated that during her physical examination, she observed anatomical changes in Bessie's genitalia that, although not conclusive, were consistent with sexual abuse. Thompson also observed anatomical abnormalities in Loretta's genitalia that would have been caused by penetration and, therefore, Thompson concluded that Loretta had been sexually molested. Thompson testified that in light of her findings, she encouraged Bessie and Loretta to continue their sexual abuse counseling.
Thompson testified that it is common for children to delay reporting sexual abuse because child sexual abuse is a "grooming process" that occurs over a period of time. According to Thompson, the perpetrator first develops a trust relationship with a victim, then begins touching the victim and, finally, moves to penetration. Thompson testified that sexual abuse victims often do not report the abuse because they are afraid that no one will believe them and because often the perpetrator makes threats of harm against them.
Thompson also testified that young girls often do not know when they are being sexually penetrated because the sensation is very confusing.
Appellant called three witnesses and testified on his own behalf. Mell Gilkerson, Jr. testified that he had known appellant for fifteen years and frequently visited his home. Gilkerson testified that there were always many people at appellant's home and that appellant would read the Bible to them.
Donald Moorehead, appellant's brother-in-law, testified that he lived four houses down from appellant and visited his house frequently. According to Moorehead, when he visited, appellant would either be in the dining room or on the front porch of the house, reading his Bible.
Linda Carte, appellant's wife, testified that in 1993 and 1994 there were sixteen people living in their house. She testified that appellant had not worked in years because of his health problems and would spend the day on the front porch of the house or at the dining room table, reading his Bible and talking to people. Appellant was also the Sunday School Superintendent at a local church and he and Linda would take neighborhood children, including Bessie and Loretta Poling, to church with them approximately twice each month.
Linda testified that Loretta and Timothy Poling never stayed overnight at their house and that when they visited, their mother was always with them. She also testified that she went to West Virginia in September of 1994 after her father died and that appellant was not home alone while she was gone.
Appellant testified that he has emphysema and had last worked in 1984. According to appellant, during the day he spent his time in the basement watching television, or sitting at the dining room table reading the Bible. Appellant stated that he was never alone in the basement with any neighborhood children and denied that Timothy Poling ever slept at his house. Appellant also testified that he never asked any of the neighborhood children to clean his house or to make him coffee. Appellant denied ever sexually molesting anyone. He also denied ever offering anyone money for sex, although he testified that he liked to help people by giving them money or food or taking them to church.
At the conclusion of appellant's testimony, the defense rested. After the state's last witness testified, appellant renewed his Crim.R. 29 motion for acquittal. Although there is no ruling in the record, the trial court apparently denied the motion because it instructed the jury on the nineteen counts remaining after the state dismissed counts nine and fifteen.
During their deliberations, the jury submitted a question to the trial court, requesting the definitions of rape, felonious assault and felonious sexual penetration, and a "clarification of each count for Loretta." After the trial court answered the jury's question, the jury found appellant guilty on all nineteen counts.
Appellant was sentenced to life imprisonment on counts one, four, five, six, seven, eight, ten, eleven, twelve, thirteen and fourteen; and to consecutive terms of ten to twenty-five years on count two; eight to fifteen years on count three; two years on counts sixteen, seventeen and eighteen; and six months on counts nineteen, twenty and twenty-one.
Appellant timely appealed, assigning the following assignments of error for our review:
 I. APPELLANT WAS DENIED DUE PROCESS OF LAW AND/OR THE STATE OF OHIO COMMITTED INTENTIONAL PROSECUTORIAL MISCONDUCT BY THE WITHHOLDING OF MORE SPECIFIC DATES AND TIMES OF THE ALLEGED OFFENSES AND/OR BY FAILING TO DISCLOSE SAID SPECIFIC DATES AND TIMES IN THE BILL OF PARTICULARS.
 II. APPELLANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND PLAIN ERROR OCCURRED WHEN APPELLEE'S EXPERT WITNESS RENDERED AN OPINION AS TO THE VERACITY OF TWO OF THE ALLEGED VICTIMS AND AS TO "WHAT CHILD ABUSE IS."
 III. APPELLANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW AND PLAIN ERROR OCCURRED WHEN APPELLEE'S EXPERT WITNESS TESTIFIED AS TO "WHAT CHILD SEXUAL ABUSE IS."
 IV. THE TRIAL COURT ABUSED ITS DISCRETION AND PLAIN ERROR RESULTED WHEN THE TRIAL COURT ANSWERED THE JURY QUESTIONS RELATIVE TO THE DEFINITIONS OF RAPE AND FELONIOUS SEXUAL PENETRATION, AND "CLARIFICATION OF EACH COUNT FOR LORETTA," IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS TO A JURY VERDICT, AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND TO DUE PROCESS OF LAW, AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 V. THE TRIAL COURT ERRED AS A MATTER OF LAW AND TO THE PREJUDICE OF APPELLANT BY DENYING APPELLANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL AS TO SEVERAL COUNTS OF THE INDICTMENT PURSUANT TO CRIM.R. 29(A) IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE CONSTITUTION OF THE STATE OF OHIO.
 VI. THE JUDGMENTS OF CONVICTION ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW, AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.
 VII. THE PREPARATION AND PERFORMANCE OF APPELLANT'S TRIAL COUNSEL WAS DEFICIENT AND PREJUDICED APPELLANT IN SUCH A WAY AS TO VIOLATE THE APPELLANT'S RIGHT AS GUARANTEED BY THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
We note at the outset that appellant failed to raise his first, second, third and fourth assignments of error in the trial court. Under Crim.R. 52 (B), we have discretion to recognize "plain errors or defects affecting substantial rights * * * although they were not brought to the attention of the court." Notice of plain error under Crim.R. 52(B), however, is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. Thus, an alleged error "does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise." Id., paragraph two of the syllabus.
In his first assignment of error, appellant asserts that the state committed intentional prosecutorial misconduct by withholding specific dates and times of the alleged offenses in the bill of particulars. Appellant contends that this misconduct deprived him of due process of law.
Appellant made two requests for a bill of particulars, which the state provided three days before trial. The bill did not narrow or specify the times of the offenses as alleged in the indictment.
R.C. 2941.07 mandates that upon request for a bill of particulars, the prosecution shall furnish a bill of particulars setting up specifically the nature of the offense charged and the conduct of the defendant which is alleged to constitute the offense. Details concerning specific dates and times are not generally required in the bill of particulars as they are not usually related to the conduct involved. State v.Sellards (1985), 17 Ohio St.3d 169, 171; State v. Gingell
(1982), 7 Ohio App.3d 364, 367. If the state possesses such temporal information, however, it must, in response to a motion for a bill of particulars, furnish the accused with specific dates and times. Sellards, supra; Gingell, supra at 367.
Appellant asserts that the state was in possession of more specific information regarding the date and time of the alleged offenses against Bessie Poling than those provided in the bill of particulars because on July 3, 1996, before appellant was indicted, Bessie gave a statement to Detective Calabrese, in which she stated:
Q. When did this happen?
 A. I think it was February of 1994 on a Saturday about 6:00 in the afternoon.
Q. When was the next time something happened?
 A. March of 1994 just after my mother (sic) birthday which is March 11.
Q. Where did this take place at?
A. Wendell (sic) house.
Q. Can you tell me what happened?
 A. I think it was a Friday, it was when the family was leaving to go to West Virginia for a funeral. . . .
Appellant argues that the state's failure to provide this information prior to trial was intentional misconduct that prohibited him from asserting an alibi defense. Appellant argues that if he had successfully established an alibi as to one of the alleged incidents testified to by Bessie Poling, the veracity of the other testifying witnesses would have been suspect and, therefore, the state's failure to meet its burden was plain error that materially prejudiced his ability to defend against all of the charges.
The state argues that, at trial, appellant questioned Bessie about her statement and, therefore, the state did not have more specific dates than those provided to appellant. We do not agree.
It is apparent from the record that the specific information regarding the time of the alleged criminal conduct which was contained in the July 3, 1996 statement was only discovered by counsel for appellant pursuant to a Crim.R. 16 motion made before cross-examining Bessie. Thus, the state did have more specific dates and should have provided them to appellant in the bill of particulars.
There is no evidence, however, that the state intentionally withheld this information. Moreover, the record in this case does not indicate that the state's failure to provide appellant with the specific dates was a material detriment to the preparation of his defense. After receiving the bill of particulars before trial, appellant made no further pretrial motions regarding the temporal aspects of the crimes charged in the indictment. Moreover, during trial, as the evidence of the dates came out, appellant made no motions for continuance to allow him to use the information to prepare his cross-examination or case. Furthermore, although he claims that he was denied the ability to present an alibi defense, appellant never filed a notice of intent to rely on an alibi, as required by Crim.R. 12.1.
Accordingly, we cannot conclude that appellant was prejudiced by the state's failure to provide more specific dates in the bill of particulars. Appellant's first assignment of error is, therefore, overruled.
In his second assignment of error, appellant asserts that he was denied his state and federal constitutional rights to a fair trial because the state's expert, Marcia Thompson, improperly rendered an opinion regarding the veracity of Bessie and Loretta Poling's allegations against appellant. Appellant alleges that Thompson improperly testified regarding Bessie and Loretta's veracity three times: 1) when she stated that the anatomical changes she observed in Bessie's genitalia were consistent with child sexual abuse; 2) when she stated that she advised Bessie and Loretta to continue their counseling therapy; and 3) when she stated that she ruled out any trauma other than penetration to Bessie and Loretta's genitalia. Appellant argues that this testimony was an attempt to do indirectly what cannot be done directly; i.e., comment on the veracity of statements made by a child witness. We disagree.
An expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant. State v.Boston (1989), 46 Ohio St.3d 108, syllabus. Expert testimony cannot be used to show that a child is telling the truth or that the child accurately testified because the trier of fact, and not the expert, is burdened with assessing the credibility and veracity of witnesses. State v. Moreland (1990), 50 Ohio St.3d 58,62. An expert's opinion regarding whether there was sexual abuse, however, is admissible pursuant to Evid.R. 702 and 704. Boston, supra at 128.
During direct examination of Thompson, the following colloquy occurred:
 Q. Now, as a result of your training and history, the history given to you by the child and your physical examination, do you have an opinion, based on a reasonable scientific certainty — or do you have an assessment, based on reasonable scientific certainty, of whether or not this child was a victim of sexual — child sexual abuse.
A. Yes.
Q. And what was that?
 A. That she — that there definitely was sexual contact there, and the anatomical changes of those — of the hymen, the fossa navicularis, and the posterior fourchette are consistent with sexual contact.
Q. Now, consistent with; is that correct?
A. Yes.
 Q. Now, were they absolutely conclusive of child sexual abuse?
A. No.
 Q. Okay. And what would you need in order to get a conclusive assessment of child sexual abuse?
 A. I would need semen or sperm or she would be pregnant.
Appellant argues that because the changes in Bessie's genitalia could have been caused by her admitted sexual encounter with her boyfriend, Thompson's testimony was intended to verify that Bessie's claims against appellant were true. We disagree. We read it as nothing more than Thompson offering her expert opinion that Bessie was likely the victim of child sexual abuse. "Expert testimony on the ultimate issue of whether sexual abuse has occurred in a particular case is helpful to jurors and is therefore admissible pursuant to Evid.R. 702 and 704." State v. Gersin (1996), 76 Ohio St.3d 491,494.
Appellant also objects to Thompson's testimony regarding her advice to Bessie and Loretta that they continue their counseling therapy. Thompson testified as follows:
 Q. Do you also, as a nurse practitioner, have occasion to, in your assessment, make suggestions of whether or not a patient should seek any kind of counseling or therapy?
A. Yes.
 Q. All right. And did you make any assessment as to Bessie along these lines?
A. Yes.
Q. What is that?
 A. I encouraged her to continue her counseling therapy as directed by her counselor.
Q. Okay. So she was already in counseling?
A. Yes.
 Q. All right. And did you make any assessment along those lines as it has to do with Loretta?
A. Yes.
Q. And what is that?
 A. The same, continue her counseling therapy as directed by her counselor.
Appellant contends that the logical inference from this testimony is that if Thompson encouraged Bessie and Loretta to continue therapy for sexual abuse, she must have felt that they were telling the truth. Therefore, appellant argues, the testimony was improper because it was an indirect expert opinion that Bessie and Loretta were truthful regarding their allegations against appellant. We disagree that Thompson's testimony amounted to a back-handed way of bolstering Bessie and Loretta's credibility. Our review of the testimony indicates that it is nothing more than Thompson's testimony regarding what she told Bessie and Loretta during their meeting with her.
Finally, appellant argues that Thompson offered an indirect expert opinion regarding Bessie and Loretta's veracity when she testified that she had ruled out any trauma other than sexual penetration to either Bessie or Loretta's genitalia. The state elicited the following testimony from Thompson regarding her physical examinations of the girls:
 Q. All right. And because I can't remember whether or not you testified to this, did you rule out any other kind of trauma to Loretta's genitalia as a part of getting the history?
A. Yes.
 Q. The abnormalities — in your training and experience, the abnormalities that you have described on Loretta in her genitalia, would those have been caused by penetration of her genitalia?
A. Yes.
 Q. Okay. A penis could have caused those abnormalities?
A. Yes.
 Q. And on Bessie, the abnormalities that you found, would those have been caused by penetration?
A. Yes.
 Q. All right. Would a penis — could a penis have caused those abnormalities?
A. Yes.
 Q. All right. And it's your testimony that there was no other kind of trauma experienced by either of these two girls to their genitalia?
A. Correct.
Appellant asserts that Thompson could only rule out any trauma other than penetration if she believed Bessie and Loretta's statements to her, and, therefore, this testimony likewise offered an indirect expert opinion regarding the veracity of Bessie and Loretta's allegations against appellant. We disagree.
Thompson merely reported the results of her medical and physical examinations of Bessie and Loretta and the assessment that she made as a result of those examinations. Her testimony offered no commentary regarding whether Bessie and Loretta were telling the truth regarding their allegations against appellant. Although Boston proscribes expert testimony offering an opinion as to the truth of a child's statements, it does not proscribe testimony which is additional support for the truth of the facts testified to by the child, or which assists the fact-finder in assessing the child's veracity. State v. Stowers
(1998), 81 Ohio St.3d 260, 262-63. Accordingly, Thompson's testimony was properly admitted.
Appellant's second assignment of error is overruled.
In his third assignment of error, appellant argues that the state's expert improperly testified as to what child sexual abuse is. Specifically, appellant argues that Thompson improperly testified as follows:
 [Y]ou have to understand what child sexual abuse is. It is a grooming process of that particular child. It isn't just a one-time event. It occurs over a period of time.
 What happens is the child is — there's this trust relationship first, let's get to know you, I'm really interested in you. And kids like that attention. They need that attention. They starve for it. They want to be loved and cared for and needed. And so this is how it begins. And as it progresses along a continuum, this relationship then turns into touching, and then eventually at the end of the continuum, where there is penetration going on.
 Well, during that process of the physical features going on, there's the emotional component to that, too, where the child is then — that relationship then is where no one is going to believe you, no — they're going to make fun of you, they are all going to tell you it is your fault, and then it turns into, if you do tell, then I'm going to hurt you or I'm going to kill you or I'm going to hurt a family member or somebody else or something of significance to that child. So there is that emotional bond or tie to that child where they are afraid to let it — to stop it because of threats that are made against them and fear that nobody will believe them.
Appellant argues that this testimony was improper because although Thompson was qualified as an expert in her field of evaluating children who are suspected of being sexually abused, she was not qualified to define what child sexual abuse is. We disagree.
Thompson's testimony qualifies under Evid.R. 702(B) based upon her "specialized knowledge, * * * experience, training, [and] education regarding the subject matter * * * * ." She is a board certified nurse practitioner, belongs to numerous professional and child abuse organizations, and teaches about child sexual abuse and the evaluation of abused children at Case Western Reserve University and Akron University. Through her specialized training and professional experience, Thompson acquired specialized knowledge about child sexual abuse that the average person lacks. Her testimony, therefore, was properly admitted.
Appellant asserts, however, that even if Thompson was properly qualified to testify regarding what child sexual abuse is, her testimony was offered to show character traits of a child sexual abuser and to show that appellant acted in conformity therewith, in violation of Evid.R. 404.
Evid.R. 404(A) states:
 Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion * * * .
The trial court may permit expert testimony on matters outside or beyond the experience of the jury when it concludes that the testimony will assist the trier of fact in resolving matters before it. Evid.R. 702. The discretion of the trial court in such areas is broad, and its decision to admit or exclude expert testimony will be reversed only for a clear abuse. State v. Williams (1983), 4 Ohio St.3d 53.
We find no abuse of discretion in permitting Thompson's testimony. Her testimony was in response to a question from the prosecutor regarding whether it is common for a victim of child sexual abuse to allow the abuse to go on for some time before reporting it. Thus, her testimony was offered not for the purpose of proving, by inference, that appellant had committed the offenses for which he was charged, but rather, to explain why it had taken Bessie, Loretta and Timothy so long to report the offenses — an issue that appellant repeatedly raised on cross-examination of each of these three witnesses.
Evid.R. 702 provides that an expert witness may testify about matters beyond the knowledge or experience of the jury if the testimony is based on reliable, scientific or other specialized information. We do not believe that an ordinary juror would be conversant with a child sexual abuse victim's tendency to delay reporting the abuse. Therefore, Thompson's expert testimony, which concerned a matter outside the competence of the jury and which was based upon her specialized knowledge about child sexual abuse, was properly admitted pursuant to Evid.R. 702.
Appellant's third assignment of error is overruled.
In his fourth assignment of error, appellant asserts that the trial court abused its discretion, resulting in plain error, when it responded to the jury question, which requested the definitions of rape, felonious assault, felonious sexual penetration and a "clarification of each count for Loretta." After explaining that there was no felonious assault charge in the case, the trial court instructed the jury. Appellant objects to the following colloquy:
* * *
 THE COURT: What we talk about is sexual conduct with rape.
 Cunnilingus means a sexual act committed with the mouth and the female sexual organ. So if a man places his mouth, his lips, his tongue, anything like that, with the very slightest penetration, even on the — what's the term that the doctor used, the —
PROSECUTOR: Labia majora.
 THE COURT: The labia majora, just the slightest penetration of that, all right, just the slightest, by the tongue upon the female sexual organ, we call it, that is cunnilingus. That is also rape, you see, which we told you before.
* * *
 Now, what is sexual penetration? The defendant is charged with felonious sexual penetration. Before you find the defendant guilty, you must find beyond a reasonable doubt that on or about the days that are set forth in the indictment, and in Cuyahoga County, Ohio, the defendant, without privilege to do so, inserted any part of his body, which — a finger, things of that nature, into the vaginal or anal cavity of another. The slightest penetration is all that is necessary, you see. And also they have to show either the victim was not the spouse of the defendant or the person was less than 13 years of age, whether or not the defendant knew of such age, see.
 So you have to recall whether there was evidence of that. If you're talking about Loretta, any of those acts with Loretta, you see. And I don't want to highlight anything, because my interpretation may be different than yours with regards to anything we're talking about.
Does that make it any easier for you?
JUROR NO. 9: Can I ask a question?
THE COURT: Yes.
 JUROR NO. 9: Sexual penetration is using something other than things described in rape or would — like the penis —
 THE COURT: Felonious sexual penetration is, I would say, the using of the hand.
JUROR NO. 9: Okay.
THE COURT: Or the finger.
JUROR NO. 9: Okay.
 THE COURT: And there was some sort of — the slightest penetration.
JUROR NO. 9: Okay.
 THE COURT: All the other — I don't know if the tongue is an organ.
JUROR NO. 9: Yeah, that would be.
THE COURT: That would be rape.
JUROR NO. 9: Okay.
 THE COURT: Making an individual place her mouth on his —
JUROR NO. 9: That would be rape.
 THE COURT: That would be rape. Plus we would call it — the classic version of rape is penis in the vagina, if that helps you.
Appellant argues that the trial court's instruction improperly bolstered Loretta's testimony and effectively instructed the jury to convict appellant by referring to the acts that appellant had allegedly engaged in with Loretta. Appellant also asserts that the trial court's response to the jury question lessened the prosecutor's burden of proof beyond a reasonable doubt and, therefore, violated appellant's rights to a jury verdict and due process of law.
Where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request. State v. Carter (1995), 72 Ohio St.3d 545,553. A reversal of a conviction based upon a trial court's response to such a request requires a showing that the trial court abused its discretion. Id.
We find no abuse of discretion here. The trial court did not make any conclusions regarding appellant's actions in relation to the defined terms nor did the trial court express any opinion regarding any of the facts with the jury. Rather, the court correctly defined the requested terms for the jury and answered the questions from Juror No. 9. In response to the jury's question for a "clarification of each count for Loretta," the trial court properly instructed the jury to consider whether any of the alleged acts had occurred with Loretta. Moreover, the trial court specifically told the jury that he did not want to highlight anything with respect to Loretta, because his interpretation of the facts could be different than the jury's.
We are not persuaded that the trial court's response to the jury question was error, much less plain error. Accordingly, appellant's fourth assignment of error is overruled.
In his fifth assignment of error, appellant asserts that the trial court erred in denying his Rule 29 motion for acquittal as to four of the five rape charges and at least two of the felonious sexual penetration charges relating to Loretta Poling.
Crim.R. 29(A) provides, in pertinent part:
 The court on motion of a defendant * * * shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses.
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence submitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The weight and credibility of the evidence are left to the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
R.C. 2907.02 states, in pertinent part:
 (A) (1) (b) No person shall engage in sexual conduct with another * * * when * * * the other person is less than thirteen years of age * * * (A) (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
R.C. 2907.01(A) defines "sexual conduct" as:
 [V]aginal intercourse between a male and female, and anal intercourse, fellatio, and cunnilingus between persons regardless of sex. Penetration, however, slight, is sufficient to complete vaginal or anal intercourse.
Appellant argues that Loretta's testimony that appellant forced her to perform fellatio on him is insufficient to support a rape conviction because there was no evidence regarding stimulation of the penis or the sexual satisfaction of appellant, which, appellant argues, is necessary pursuant to the Ohio Supreme Court opinion in In re M.D. (1988), 38 Ohio St.3d 149.
In re M.D. involved a five-year-old boy who, while "playing doctor" with a five-year-old girl, inserted his penis in her mouth. In that case, there was no transcript of the proceedings below, and the Supreme Court concluded that the record demonstrated neither an element of sexual satisfaction nor of oral stimulation, and, in fact, that neither element was physiologically or emotionally possible in a five-year-old child. Accordingly, the Court held that fellatio did not occur and, therefore, no rape was committed.
Such is not the case here. Appellant is an adult male. Although the record may not indicate oral stimulation of the penis, viewing the evidence in a light most favorable to the prosecution, a jury could have reasonably concluded, in light of appellant's other sexual activities with Loretta, that appellant forced Loretta to perform fellatio on him for the purpose of sexual satisfaction.
Appellant also argues that there was insufficient evidence of vaginal rape and felonious sexual penetration because Loretta testified that appellant "tried to, but never did" put his penis or finger inside her. This argument is without merit.
The state's expert, Marcia Thompson, testified that her physical examination of Loretta confirmed that she had been vaginally penetrated. Moreover, Thompson testified that young girls often do not understand when they are being penetrated because the sensation is so confusing. Therefore, because Loretta testified that no one, other than appellant, ever tried to touch her vagina or to put anything inside her vagina, the jury could have reasonably concluded that appellant actually penetrated Loretta.
Finally, appellant argues that even if there was sufficient evidence of penetration, Loretta's testimony that appellant raped her more than once but not more than five times, and that the felonious sexual penetration occurred more than once and not more than five times, is not sufficient to support five rape convictions and four felonious sexual penetration convictions. We think it is.
Our review of the record reveals that Loretta testified that appellant tried to insert his penis and his finger in her vagina "several" times. She described in detail at least three occasions in which appellant tried to insert his penis in her vagina. She also testified that she did not know what appellant was doing until "the third or fourth time he done it to me." Viewing Loretta's testimony in a light most favorable to the prosecution, as we are required to do, we find that a jury could have reasonably concluded that appellant raped Loretta five times and feloniously sexually penetrated her four times.
Appellant's fifth assignment of error is overruled.
In his sixth assignment of error, appellant asserts that his convictions are against the manifest weight of the evidence. In support of this assignment of error, appellant points to the inconsistencies between Bessie Poling's trial testimony and her July 3, 1996 statement to Detective Calabrese about when the offenses occurred and whether appellant ejaculated or not and to the "curious" similarities between Bessie and Loretta Poling's testimony.
When reviewing the claim that the judgment in a criminal case is against the manifest weight of the evidence, this court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Martin (1983), 20 Ohio App.3d 172.
After reviewing the entire record, we cannot say that in resolving conflicts in the evidence, the jury lost its way. On redirect, Bessie testified that although she could not remember the exact date of the incidents, she remembered that they happened. Moreover, the inconsistencies between her trial testimony and her statement to Detective Calabrese regarding whether she observed "white stuff" come out of appellant's penis are most likely due to Bessie's naivete regarding the term "ejaculate."
Appellant also asserts that Bessie and Loretta's testimony is suspect because of "curious coincidences" in their testimony regarding where the offenses took place (in appellant's basement and at his church) and Loretta's use, like Bessie's, of the term "white stuff." The jury heard the testimony and was aware of the similarities in Bessie's and Loretta's testimony. The weight to be given the evidence and the credibility of witnesses are primarily matters for the trier of fact.State v. DeHass (1976), 10 Ohio St.2d 230, paragraph one of the syllabus.
We have reviewed the entire record of proceedings before the trial court. Upon thorough consideration of the law and the evidence presented at trial, we find that there was substantial, competent, credible evidence upon which the jury could find appellant guilty of rape, attempted rape, kidnapping, felonious sexual penetration, gross sexual imposition and importuning. When we weigh the evidence and all reasonable inferences, we conclude that the jury did not so clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.
Appellant's sixth assignment of error is overruled.
In his seventh assignment of error, appellant argues that he was denied his constitutionally guaranteed right to effective assistance of counsel because his trial counsel failed to: 1) require the state to disclose the specific dates of the offenses; 2) make a Crim.R. 33 motion for a mistrial upon discovery that the state had withheld specific dates and times of the offenses; 3) make any objection to Thompson's expert testimony; 4) object to the trial court ordering appellant to put his witnesses on out of order; and 5) object to the trial court's response to the jury question.
As explained by the Ohio Supreme Court in State v. Campbell
(1994), 69 Ohio St.3d 38, 43:
 A defendant who claims ineffective assistance must show deficient performance by counsel and resulting prejudice. Strickland v. Washington
(1984), 466 U.S. 668. The performance inquiry requires the court to ask whether, considering all the circumstances, 'counsel's representation fell below an objective standard of reasonableness.' Id. at 688. The court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *.' Id. at 689. The prejudice inquiry 'is whether there is a reasonable probability that, absent the errors, the factfinder would have' acquitted the defendant * * *. Id. at 695. 'A reasonable probability is a probability sufficient to undermine confidence in an outcome.' Id. at 694.
In this case, we have already concluded that appellant was not prejudiced by the state's failure to disclose specific dates and times in the bill of particulars. Accordingly, trial counsel's failure to request more specificity in the allegations and to make a Crim.R. 33 motion for mistrial was not deficient.
Likewise, we have concluded that the testimony of the state's expert was properly admitted and that the trial court committed no error when it responded to the jury's question. Accordingly, trial counsel's failure to object to the expert testimony and to the trial court's response to the jury question was also not deficient.
Finally, appellant has not presented any evidence that he was prejudiced by trial counsel's agreement to present the defense witnesses before the state had concluded its case-in-chief. Accordingly, appellant has failed to show that his counsel was ineffective.
Appellant's seventh assignment of error is overruled.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 _______________________________ TIMOTHY E. McMONAGLE PRESIDING JUDGE
 KENNETH A. ROCCO, J. and MICHAEL J. CORRIGAN, J., CONCUR.
N.B. This entry is an announcement of the court's decision. See App.R. 22(D) and 26(A); Loc.App.R. 22(B), 22(D) and 26(A); Loc.App.R. 27. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's announcement of decision by the clerk per App.R. 22(E). See, also, S.Ct. Prac.R. II, Section 2(A)(1).
[1] Thompson was the state's last witness but was unavailable on the day she was scheduled to testify. Accordingly, in the interest of judicial economy and with the consent of defense counsel, appellant put on his witnesses before Thompson testified. Prior to putting on his witnesses, and although the state had not rested, appellant moved for acquittal pursuant to Crim.R. 29. The trial court denied the motion but instructed appellant that he could renew his motion when the state rested its case.